IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 14, 2010

## STATE OF TENNESSEE v. COURTENAY DARRELL ROBERTSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-433       Roy B. Morgan, Jr., Judge**

---

**No. W2009-01853-CCA-R3-CD  - Filed November 18, 2010**

---

A Madison County jury convicted the defendant, Courtenay Darrell Robertson, of attempted second degree murder, a Class B felony; aggravated arson, a Class A felony; and felony evading arrest, a Class E felony.  The trial court sentenced the defendant as a Range II offender to twenty years at 35% for attempted second degree murder, thirty-five years at 100% for aggravated arson, and four years at 35% for felony evading arrest, to be served in the Tennessee Department of Correction.  The trial court ordered the defendant to serve the aggravated arson sentence consecutively to the attempted second degree murder sentence and to serve the sentence for felony evading arrest concurrently with the other two sentences, for a total effective sentence of fifty-five years.  On appeal, the defendant argues that (1) the evidence was insufficient to support the aggravated arson conviction; (2) dual convictions for aggravated arson and attempted second degree murder violate double jeopardy principles; and (3) his sentence is excessive.  Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Courtenay Darrell Robertson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# Background

In August 2008, a Madison County grand jury indicted the defendant, Courtenay Darrell Robertson, on four counts: (1) the attempted premeditated murder of Belinda Jones, a Class A felony; (2) the aggravated assault of Belinda Jones, a Class C felony; (3) aggravated arson, a Class A felony; and (4) felony evading arrest, a Class E felony. The parties tried the case before a jury on May 19, 2009.

*State's Proof.* Nicky Parker testified that in November 2007, she lived in an apartment complex on Daughtery Street in Jackson, Tennessee. The victim was her neighbor. On November 24, 2007, at approximately 5:00 a.m., Ms. Parker was asleep in her apartment when screaming outside awakened her. The screaming continued, and the fire alarm sounded. Ms. Parker said that she thought the apartment was on fire, so she opened the front door. When she opened the door, she saw the victim standing in the doorway. Ms. Parker testified that she could tell the victim had been burned because the skin on her face and chest was peeling off and had become discolored. The victim said, "[S]omebody call 911[;] he just set me on fire." Ms. Parker brought the victim into her apartment, wrapped her in a blanket, and sat her on a table. She called 911, and as the dispatcher asked questions, she relayed the questions to the victim and told the dispatcher the victim's responses. The victim said that her boyfriend, the defendant, was responsible and that he was driving a purple car. Ms. Parker could not recall the model of the car. Ms. Parker testified that she went to the victim's apartment and discovered a box burning under the table. She put out the fire. Ms. Parker testified that there was a mud puddle behind the apartment building, but the victim did not say anything to her about the puddle.

Officer Jay Stanfill, a patrol officer with the Jackson Police Department, testified that on November 24, 2007, he responded to a call that an individual had been set on fire at 504 Daughtery Street. He arrived at the location within approximately three minutes. He went inside Ms. Parker's apartment and asked her where the individual was. Officer Stanfill said that he did not realize that the seated figure in front of him was a human until Ms. Parker instructed him that the figure was the victim. He testified, "[I]t just didn't catch my eye as being a person because it was so badly disfigured and just different colors. It didn't look human." Officer Stanfill said that the victim's skin on her forearms and neck was "peeled back and broken." Her jaw "looked more like plastic . . . . [Her skin] was fused together . . . ."

Officer Stanfill asked the victim who was responsible, and she said that her boyfriend, the defendant, was. He could not recall asking the victim what the defendant was driving, but he said that another individual at the scene confirmed that the defendant was driving a 1970s model, purple Catalina. Officer Stanfill, who was a trained crime scene technician,

-2-

took photographs of the interior of the victim's apartment. Specifically, he photographed a bottle of rubbing alcohol that did not have a top or seal; a bottle of rubbing alcohol that was half-full but capped; a beer bottle that was cool to the touch; a box of what he believed to be CDs and DVDs that had been set afire and recently extinguished; a portion of a lady's bra, which was burnt; a bottle of salt that "was almost completely melted;" a cigarette lighter; and bedding material that was in a mud puddle outside of the victim's apartment.

Dr. Michael Revelle, an emergency room physician at Jackson-Madison County General Hospital, testified as an expert in emergency medicine. Dr. Revelle treated the victim in the emergency room the morning of the incident. He testified that she had second degree burns to her face, front and back of both arms, chest, and three-quarters of her abdomen. Dr. Revelle testified that "[s]econd degree burns are probably the most painful burns you can have." He said that the integrity of her skin had diminished to the point where it was "almost melted." He also said that she "had a lot of mud and dirt [on her] as if she had tried to either roll in the mud or something to put herself out." Dr. Revelle testified that the victim told him that "her boyfriend poured rubbing alcohol on her and set her on fire." She told him that she rolled on the ground to put out the fire. Dr. Revelle estimated that sixty percent of her body was burned, and there was a high risk of her dying. Dr. Revelle stated that the mud and dirt on her body increased the risk of infection. He immediately referred her to the Elvis Presley Memorial Burn and Trauma Center in Memphis, Tennessee, and an air medical evacuation helicopter transported her there.

Officer Buddy Crowell, a patrol officer with the Jackson Police Department, testified that he was in the Lincoln Courts area when he received a call that a man had set a woman on fire on Daughtery Street. As he was driving to that location, he received information that the defendant was driving a purple Catalina. Officer Crowell saw the defendant pass by him at Whitehall Street and Highway 70. Officer Crowell testified that the defendant was driving at a high rate of speed. Officer Crowell pursued the defendant and caught up with him at Ridgecrest Road and F.E. Wright Drive, when the defendant stopped at a red light. Officer Crowell confirmed that the vehicle was a purple Catalina and radioed the license plate number to dispatch. He activated his lights and sirens and attempted to pull the defendant over. The defendant "took off in a very fast manner" toward Christmasville Road. Officer Crowell pursued the defendant, and he testified that his vehicle reached eighty miles per hour as he went over the I-40 bridge. The defendant proceeded down Christmasville Road, reaching speeds in excess of 100 miles per hour. Officer Crowell testified that he could see the defendant because he was leaning out of the vehicle's door, looking back at him. The defendant was also pointing something at Officer Crowell, but he was unable to tell what it was. Officer Crowell testified that the chase lasted between three and five miles, and the maximum speed reached was 110 miles per hour. The defendant turned off of Christmasville Road and drove into the yard of 43 Greenview Drive. The defendant got out of the vehicle

and ran into a wooded area. Officer Crowell lost sight of him and radioed for back-up. Officer Crowell testified that his patrol car's camera captured the pursuit, and the state played that video for the jury.

Officer Stephen Story, a patrol officer with the Jackson Police Department, testified that he was a part of the perimeter set up to contain the defendant after he ran away from his vehicle. A helicopter with infrared equipment was flying over the area. The officers on board the helicopter spotted a heat signature in the woods near Officer Story and directed him to the heat signature. Following their directions, Officer Story located the defendant hiding under a bush. Officer Story testified that the defendant complied with every instruction he gave. Officer Story took the defendant into custody and performed a search incident to arrest. He discovered a broken red lighter in the defendant's jacket pocket. Officer Story collected the defendant's clothing as evidence once they arrived at the Criminal Justice Center.

The victim testified that she was twenty-five years old. She had been in a relationship with the defendant since she was seventeen, and they had two daughters, ages seven and eight. The victim said that in November 2007, she and the defendant were seeing other people, and the defendant was not living with her. On November 24, 2007, the defendant knocked on her door at approximately 5:00 a.m. She let him inside, and they began arguing about their relationship. The defendant told her that he was going to throw alcohol on her. She said that she was wearing a shirt and underwear at the time. The defendant threw alcohol on her chest and struck a lighter. She said it happened very fast. The victim testified that when he struck the lighter, her shirt "just blazed up." She said that she could not describe what it felt like it. She ran outside and rolled in the grass before going to her neighbor's apartment. She yelled for her neighbor to call the police. The victim said that the defendant was standing on the porch while she was trying to put herself out, and he got into his car and drove away when she went to her neighbor's apartment. The last thing she remembered about November 24 was getting into the back of an ambulance. When she woke up several weeks later, she was in a hospital bed in Memphis. The victim testified that she did not leave the hospital until March 4, 2008. She said that she was still suffering from her injuries. She had skin grafts on one arm, and she planned to have more grafts on the other arm and possibly her neck and face.

On cross-examination, the victim testified that she and the defendant ended their exclusive relationship approximately one year prior to the incident. The night before the incident, she had a Thanksgiving meal with her friends, family, and the defendant. She recalled that she was supposed to go to Humboldt with the defendant but changed her mind. She did not remember why she did not go. She said that the argument was about her seeing other men and the defendant seeing other women, but she said that she had not been dating

anyone at the time. She recalled that the defendant did not try to aid her or extinguish the fire.

*Defense Proof.* The defendant testified that he and the victim had a good relationship until she began seeing other men. The night before he set her on fire, he made Thanksgiving dinner for them and their family and friends. Afterwards, they planned to go to Humboldt together, but the victim changed her mind about going. He was suspicious of her reasoning but went to Humboldt without her. Later that night, she picked him up in Humboldt, and they returned to Jackson. The two decided to go to a night club. The defendant said that he changed his mind about going to the club, so they bought beer and went back to the victim's apartment. The defendant said that he was living with the victim at the time and had a key to her apartment. The defendant testified that he tried to talk to the victim about why she did not want to go to Humboldt, but she became annoyed. The defendant said that she told him that she did not love him anymore and did not want to be with him. He testified, "Before I knew it[,] I had grabbed the alcohol[, and] next thing I [knew] she was on fire." He said that he grabbed a blanket and tried to put the fire out. He followed her outside with the blanket. The defendant testified that he thought he put the fire out. He said that when he looked at her, he panicked and ran away. He admitted that he was the driver of the car shown in the police footage of the high speed chase. The defendant explained that he was scared and did not know if the police would shoot him, so he tried to get to his mother's house. The defendant testified that he did not intend to harm the victim, that he loved her, and that he was sorry for what he did to her.

On cross-examination, the defendant admitted that he was responsible for the victim's injuries and that he was guilty of evading arrest. He testified that he did not tell Investigator Michael Parsons that he wanted the victim to feel the pain he was feeling. The defendant further testified that he did not sign his statement as written by Investigator Parsons because Investigator Parsons did not write his statement correctly and because an attorney had advised him to never sign anything the police wrote.

*State's Rebuttal Proof.* Investigator Michael Parsons, a violent crime investigator with the Jackson Police Department, testified that he interviewed the defendant and took notes during the interview. He testified that the defendant told him, "I should have just left, but my heart was hurting so bad I wanted her to feel the pain that I was feeling because she won't let me go." Investigator Parsons said that the defendant must not have given him a home address because he wrote "at large" on that section of the interview form.

On cross-examination, Investigator Parsons testified that the defendant told him that he had a key to the victim's apartment.

Following the close of proof and deliberations, the jury convicted the defendant of the lesser included offense of attempted second degree murder, a Class B felony; aggravated arson, a Class A felony; and felony evading arrest, a Class E felony. The trial court sentenced the defendant as a Range II offender to twenty years at 35% for attempted second degree murder, thirty-five years at 100% for aggravated arson, and four years at 35% for felony evading arrest, to be served in the Tennessee Department of Correction. The trial court ordered the defendant to serve the aggravated arson sentence consecutively to the attempted second degree murder sentence and to serve the sentence for felony evading arrest concurrently with the other two sentences, for a total effective sentence of fifty-five years. The court denied the defendant's motion for new trial, and he filed a timely notice of appeal.

**Analysis**

On appeal, the defendant argues that the evidence was insufficient to support his conviction for aggravated arson. In the alternative, he contends that dual convictions for aggravated arson and attempted second degree murder violate double jeopardy principles and that the trial court erred by imposing consecutive sentences for aggravated arson and attempted second degree murder.

*Sufficiency of the Evidence*

The defendant argues that the evidence was insufficient to support his conviction for aggravated arson. Specifically, he contends that he did not intentionally damage by means of fire any personal property of the victim because he set her person on fire. The state responds that the defendant's motive to harm the victim and not her property is irrelevant to his conviction. Additionally, the state argues that the victim's shirt was personal property.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans,* 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to the appellate court why the evidence will not support the jury's verdict. *State v. Carruthers,* 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *State v. Evans,* 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict, approved by the trial judge, accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers,* 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the

evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid,* 91 S.W.3d 247, 277 (Tenn. 2002).

To sustain the defendant's conviction for aggravated arson, the state had to prove beyond a reasonable doubt that the defendant committed arson and that the victim suffered serious bodily injury. In this case, the indictment alleged that the defendant committed arson as defined in Tennessee Code Annotated section 39-14-303 by setting fire to the personal property of the victim without her consent. The fact that the victim experienced serious bodily injury as a result of the fire is not in dispute.

The central issue is whether the victim's shirt constituted "personal property" when she was wearing the shirt at the time the defendant poured alcohol on her and set the fire. The Tennessee Code Annotated defines "property" as "anything of value, including, but not limited to, money, real estate, tangible or intangible personal property . . . ." Tenn. Code. Ann. § 39-11-106(a)(28). "'Personal property' includes money, goods, chattels, things in action, and evidences of debt." *Id.* § 1-3-105 (21). Under these definitions, the victim's shirt constituted personal property. The question remains, however, whether the fact that she was wearing the shirt transformed the character of the shirt as personal property. In other words, were the victim's shirt and her person one and the same? While there does not appear to be any Tennessee cases on point, certain out-of-state cases are helpful to our review of this issue.

In the California case of *People v. Reese*, the California Court of Appeal reasoned that the legislature intended to protect personal clothing, "particularly clothing being worn at the time of the burning or fire," when it expanded the definition of the term "property," as used in the arson statute, to include personal property. *People v. Reese*, 227 Cal. Rptr. 526, 528 (Cal. Ct. App. 1986).

In *State v. Harrington*, the defendant poured lamp oil on the victim and her clothing and set her and her clothing on fire. *Harrington*, 782 So.2d 505, 506 (Fla. Dist. Ct. App. 2001). The victim subsequently died because of her injuries, and the state charged the defendant with murder and arson. *Id.* The trial court dismissed the arson charge, in part because it did not consider the burning of the victim's clothing to be sufficient to support the charge. In interpreting the arson statute, which defined arson as damaging by fire "a dwelling or its contents," the Florida District Court of Appeal ruled that the victim's clothing constituted contents of a dwelling. It reasoned as follows:

-7-

Clearly, if [the defendant] had gone to a closet and set fire to any of [the victim's] clothing hanging in the closet, we would not be faced with this issue. Merely because [the victim] was wearing the clothing at the time [the defendant] set the clothing on fire does not make them any less "contents" of the dwelling.

*Id.* at 507 (citation omitted).

We find the analysis and reasoning set forth in the aforementioned cases to be persuasive and applicable to this case. In this case, the evidence established that the defendant poured alcohol on the victim and her shirt, then struck a lighter. The victim testified that when the defendant struck the lighter, her shirt "just blazed up." She did not give consent to the defendant to set fire to her shirt, and she suffered second degree burns to sixty percent of her body. We conclude, therefore, that the evidence was sufficient for a rational jury to find, beyond a reasonable doubt, that the defendant was guilty of aggravated arson.

*Double Jeopardy*

For his second argument, the defendant claims that dual convictions for aggravated arson and attempted second degree murder, under the facts of this case, violate his constitutional protection against double jeopardy. Specifically, he argues that the same course of conduct established both offenses; the offenses involved one victim and a single discrete act; and the statutes have the same legislative purpose. The state responds that each offense required proof independent of the other and that the statutes have different legislative purposes.

The Double Jeopardy Clause in the United States Constitution provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const. amend V. Similarly, the Tennessee Constitution states that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. The constitutional right against double jeopardy protects against, *inter alia*, multiple punishments for the same offense. *State v. Denton*, 938 S.W.2d 373, 378-79 (Tenn. 1996). To determine whether a defendant has received multiple punishments for the same offense, our supreme court has said that the reviewing court should consider: (1) the statutory elements of the offenses; (2) the evidence used to prove the offenses; (3) whether there were multiple victims or discrete acts; and (4) the purposes of those respective statutes. *Id.* at 381. "None of these steps is determinative; rather the results of each must be weighed and considered in relation to each other." *Id.* at 381.

A defendant commits attempted second degree murder when he or she takes a substantial step towards the knowing killing of another. Tenn. Code Ann. §§ 39-13-210(a)(1); -12-101. The indictment specifically charged the defendant with taking the substantial step of setting the victim on fire. Aggravated arson, as charged in this case, is committed when a defendant knowingly damages personal property by means of fire, without the owner's consent or with intent to destroy the property for any unlawful purpose, and any person suffers serious bodily injury as a result of the fire. *Id.* §§ 39-14-303, -302. Therefore, aggravated arson requires proof that the offender knowingly damaged property by fire, which is not an element of attempted second degree murder. Additionally, attempted second degree murder requires proof that the offender was aware that his conduct was reasonably certain to kill the victim, which is not required by the arson statutes. However, the defendant maintains that the proof was the same for each offense. Here, the proof showed that the defendant poured alcohol on the victim and her clothing, struck a cigarette lighter, and set the victim on fire. The proof that he poured alcohol on the victim's body and set her on fire supported the attempted murder conviction, and the proof that he poured alcohol on her shirt and set her shirt on fire supported the aggravated arson conviction. Under the third prong of the *Denton* analysis, we note that there was a single victim, and the same course of conduct - pouring alcohol and striking a cigarette lighter - led to both offenses. In examining the legislative purpose behind the offenses, we conclude that they are different because the plain language of the statutes reveals that the legislative intent behind the attempted second degree murder statutes is protection of the person, while the legislature intended to protect property through the arson statutes. *See* Tenn. Code Ann. §§ 39-13-210(a)(1), -12-101; 39-14-303, -302. Therefore, the elements of the offenses were not identical, the evidence proving the offenses was separate, and the legislature intended to protect different interests through the statutes. The fact that a single victim and single course of conduct were involved is not sufficient to outweigh the other three factors. We conclude that dual convictions for aggravated arson and attempted second degree murder, under the facts of this case, do not violate the principles of double jeopardy. Therefore, the defendant is without relief on this issue.

*Sentencing*

For his final argument, the defendant contends that his sentences for attempted second-degree murder and aggravated arson are excessive. Specifically, he argues that the trial court erred by applying enhancement factors that were elements of the offenses and by imposing consecutive sentences. The defendant does not challenge his offender status or the application of three of the five enhancement factors found by the trial court.

A. Standard of Review

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

### B. Enhancement Factors

It is well-settled that statutory enhancement factors may not be applied if they are essential elements of the offense or if they are inherent within the offense. *See* Tenn. Code Ann. § 40-35-114; *see also State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). In this case, the trial court found that the following enhancement factors applied: (1) the defendant has a history of criminal convictions and behavior in addition to those necessary to establish the range; (2) the defendant treated the victim with exceptional cruelty; (3) the personal injuries inflicted were particularly great; (4) the defendant had failed to comply with a sentence involving release into the community; and (5) the defendant was on probation at the time he committed the offenses. The defendant contends that the trial court improperly applied the enhancement factors that he treated the victim with exceptional cruelty and that the injuries inflicted were particularly great because those factors are elements of the offenses.

In order to sustain application of the "exceptional cruelty" enhancement factor, the facts of the case "must 'denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged.'" *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting *State v. Kelly Haynes*, No. W1999-01485-CCA-R3-CD, 2000 WL 298744, at *3 (Tenn. Crim. App., at Jackson, Mar. 14, 2000). At trial, Investigator Parsons testified that the defendant told him that he wanted the victim to experience the pain that he was feeling. In our view, this testimony denotes the infliction of pain or suffering for its own sake beyond that necessary to establish the offenses. Therefore, the trial court did not err by applying this enhancement factor.

As for the "particularly great injury" enhancement factor, the Tennessee Supreme Court has previously held that "the conditions for proving the serious bodily injury element 'satisfy the definition of a "particularly great" injury' and that 'proof of serious bodily injury will always constitute proof of a particularly great injury.'" *State v. Poole*, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting *State v. Jones*, 883 S.W.2d 597, 602 (Tenn. 1994)) (internal footnotes omitted). In this case, serious bodily injury is an essential element of aggravated arson. Tenn. Code Ann. § 39-14-302(a)(2). Therefore, we conclude that the trial court erred by applying the "particularly great injury" enhancement factor to the aggravated arson sentence. However, serious bodily injury is not an essential element of attempted second

degree murder, and the trial court did not err by applying the "particularly great injury" enhancement factor to the attempted second degree murder sentence.

An error in the application of enhancement factors will not necessarily result in modification of the sentence if the trial court, in determining the specific sentence, considered the nature and characteristics of the crime, the character and background of the defendant, and the purposes of the Sentencing Act. *See* Tenn. Code Ann. § 40-35-210(b). Despite the trial court's reliance on an inapplicable enhancement factor, the record supports the court's consideration of the remaining four enhancement factors with regard to the aggravated arson sentence. The record supports the trial court's reliance on all five enhancement factors with regard to the attempted second degree murder sentence. The record reflects that in determining the specific sentence length, the trial court considered the provisions of Tennessee Code Annotated section 40-35-210, as well as the required principles of sentencing. As such, we affirm the length of the sentences as imposed.

C. Consecutive Sentencing

The defendant contends that the trial court erred by imposing consecutive sentences for aggravated arson and attempted second degree murder because the convictions stemmed from a single act.

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of following statutory criteria apply:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
>
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

-11-

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

If the court concludes the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are unnecessary for the other categories of Tennessee Code Annotated section 40-35-115(b). *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, the trial court found that (1) the defendant had an extensive criminal history; (2) he was on probation when he committed the offenses; and (3) he was a dangerous offender. The court further found that "[t]he circumstances surrounding the commission of the offenses [were] aggravated, and . . . confinement for an extended period of time [was] necessary to protect society from the Defendant's unwillingness to lead a productive life . . . and . . . the aggregate length of sentences reasonably relate[d] to the offense[s] . . . ." A trial court need only find one statutory criterion to support an imposition of consecutive sentences. *See State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Here, the trial court found that three separate statutory criteria applied to the defendant and made the additional findings necessary under *Wilkerson* when the defendant is a dangerous offender. The record does not preponderate against the trial court's findings, and the defendant does not present any statutory or case law to support his position that consecutive sentences should not be imposed under the facts of this case. Therefore, the defendant is without relief on this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____

J.C. McLIN, JUDGE